This case is here for review upon the certificate of the Court of Appeals of Lucas county as being in conflict with the judgment of the Court of Appeals of Summit county, Ohio, in the case of State v. Kondak, as reported in 46 Ohio App. 422,188 N.E. 122.
At the September, 1931, term of the Court of Common Pleas, and, to be more specific, on January 2, 1932, Stacey L. McNary, under an indictment containing seven counts, was charged with violating the banking laws of the state of Ohio.
The bank involved is The Security-Home Trust Company of Toledo, Ohio.
The parties, in the style of the case here, are reversed from their order in the trial court. Herein, plaintiff in error, Stacey L. McNary, will be referred to as the "accused"; the defendant in error, The State *Page 499 
of Ohio, as the "State", and The Security-Home Trust Company of Toledo, Ohio, as the "bank".
Such facts as the court deems necessary will be stated in the opinion. It is well to note at the outset that The Security-Home Trust Company closed its doors on June 16, 1931, and before the opening of the next banking day it was taken over by Ira J. Fulton, Superintendent of Banks of the State of Ohio. A subsequent audit developed the fact that it was and had been for some time insolvent.
The accused complains that the Court of Appeals erred in the following particulars:
1. The court erred in overruling his motion to dismiss the petition in error filed by the State, and thereby recognized a right of the State, in a criminal case, to prosecute error from the trial court to reverse an unfavorable decision upon the merits after jeopardy has attached. In this decision the Court of Appeals refused to follow several decisions of this court, among them one rendered a few months ago, State v. Whitmore,126 Ohio St. 381, 185 N.E. 547.
2. The Court of Appeals erred in reversing the Common Pleas Court and in holding that the third and fourth counts of the indictment, as clarified by the bill of particulars, each states an offense under the criminal law of Ohio.
The third and fourth counts of the indictment, omitting formal parts, are in the words and figures following:
"Third Count: AND THE JURORS OF THE GRAND JURY * * * do further find and present that Stacey L. McNary * * * on or about the 1st day of April, in the year of our Lord one thousand, nine hundred and thirty-one, at the County of Lucas and State of Ohio, * * * being then and there an officer, to-wit, President of a bank, to-wit, The Security-Home Trust Company, * * * organized under the laws of the State of *Page 500 
Ohio, and while he, the said Stacey L. McNary, was acting in said capacity, did unlawfully and wilfully misapply certain money of said The Security-Home Trust Company, in the amount and value of Thirty-seven Thousand Five Hundred ($37,500) Dollars, in this, to-wit: that he * * *, while then and there acting in his said capacity as President of The Security-Home Trust Company, and knowing that said bank had no undivided profits from which to pay dividends, he, the said Stacey L. McNary, did, on said 1st day of April, 1931, cause to be applied to the payment of dividends to all stockholders of said bank, who were stockholders of record as of March 25, 1931, certain money of said The Security-Home Trust Company in the amount and value of Thirty-seven Thousand Five Hundred ($37,500) Dollars, all with the intent * * * to defraud and injure the said The Security-Home Trust Company, the said acts herein stated being connected in their commission with the offenses alleged in Counts One and Two of this indictment, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio."
"Fourth Count: AND THE JURORS OF THE GRAND JURY * * * do further find and present that Stacey L. McNary * * * on or about the 1st day of April, in the year of our Lord one thousand, nine hundred and Thirty-one, at the County of Lucas and State of Ohio, * * *, being then and there an officer, to-wit, President of a bank, to-wit, The Security-Home Trust Company, * * * organized under the laws of the State of Ohio, and while * * * Stacey L. McNary, was acting in said capacity, did unlawfully and wilfully misapply certain money of said The Security-Home Trust Company, in the amount and value of Thirty-seven Thousand Five Hundred ($37,500) Dollars, in this, to-wit: that he, the said Stacey L. McNary, while then and there acting in his said capacity as President of The *Page 501 
Security-Home Trust Company, and knowing that said bank had no undivided profits from which to pay dividends, he, the said Stacey L. McNary, did, on said 1st day of April, 1931, cause to be applied to the payment of dividends to all stockholders of said bank, who were stockholders of record as of March 25, 1931, certain money of said The Security-Home Trust Company in the amount and value of Thirty-seven Thousand Five Hundred ($37,500) Dollars, all with the intent then and there to defraud and injure a certain person, to-wit, Paul Merker, and certain other persons and certain other corporations, being then and there the depositors who had moneys then and there on deposit in said bank, the said acts herein stated being connected in their commission with the offenses alleged in Counts One, Two and Three of this indictment, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Ohio.
Counts one and two of the indictment were rejected by the Court of Appeals herein, hence this court is giving no consideration to the language in the third and fourth counts referring thereto.
This indictment was returned on January 2, 1932. On January 15, 1932, the accused applied to the Prosecuting Attorney of Lucas county, Ohio, for a bill of particulars, which was refused.
On January 18, 1932, the accused filed his motion to show cause why the indictment should not be dismissed and the defendant discharged because of the failure of the State to furnish him with a bill of particulars. The court thereupon ordered the Prosecuting Attorney to file a bill of particulars in the cause.
On February 8, 1933, the Prosecuting Attorney filed his bill of particulars, as follows:
"Now comes the Prosecuting Attorney of Lucas county, Ohio, and pursuant to the order of the Court *Page 502 
herein and not waiving any objections or exceptions heretofore made to the order of the Court requiring the filing of said Bill of Particulars, herewith presents his Bill of Particulars, as follows:
"The non-existence of undivided profits for dividend purposes was caused by the overvaluation of the assets of The Security-Home Trust Company, failure of said bank to charge and deduct from its actual profits all losses sustained, and depreciation in the value of the assets of said Bank.
"The Superintendent of Banks of the State of Ohio, to the knowledge of said Prosecutor, had made no order requiring said Bank to charge down the value of any assets of said Bank.
 (Signed) "Frazier Reams, "Prosecuting Attorney.
On February 18, 1933, the accused filed his motion to strike the bill of particulars from the file, and on March 15, 1933, this motion was overruled by the court. On March 17, 1933, the accused filed a motion to quash the indictment. On April 4, 1933, this motion was overruled as to the first six counts of the indictment and sustained as to the seventh.
On April 7, 1933, the accused filed his demurrer to the indictment, which was overruled by the court on June 7, 1933.
On June 10, 1933, the accused was arraigned on the indictment, entered a plea of "Not Guilty," and the cause was set for trial July 5, 1933.
Impaneling of the jury for the trial of the case was begun on July 5, 1933, and on July 6, 1933, the accused moved for an additional bill of particulars, which motion was overruled by the court. Impaneling of the jury was completed on July 7, 1933, the jury was sworn and opening statement made by counsel for the State.
The accused then moved the court to require the *Page 503 
State to elect whether it would proceed against the accused as a principal or as an aider and abettor. This motion was overruled, counsel for the accused stated his defense, and court adjourned until July 12, 1933, on which date the State called its first witness, who was duly sworn.
Thereupon, and before any evidence was heard, the accused demurred and objected to the introduction of any evidence, for the reason that the indictment failed to state a crime under the laws of Ohio, directing the motion to each count of the indictment separately, and the objection and demurrer were overruled by the court.
On July 17, 1933, the court entered an order continuing the cause until September 18, 1933, at which time the State asked leave to withdraw a juror and continue the cause because of the alleged misconduct of a juror.
On September 18, 1933, the court overruled this motion of the State, and the trial was resumed.
On September 25, 1933, the accused renewed his objection and demurred to the introduction of evidence, on the ground that the indictment did not charge a crime under the laws of Ohio.
On September 27, 1933, the court sustained the demurrer and objection of the defendant, and dismissed and discharged the jury from further duty in the case, and ordered that the accused be released from custody under the indictment, to which action of the court, and separately as to each count of the indictment, the State of Ohio then and there excepted.
On September 30, 1933, the State filed a motion for a new trial and for a rehearing upon the demurrer to the introduction of evidence, which motion was overruled by the court on October 11, 1933, to which ruling the State by counsel excepted as to each count of the indictment. *Page 504 
On October 25, 1933, the State filed its proceeding in error in the Court of Appeals of Lucas county, Ohio.
On December 9, 1933, the accused filed his motion to dismiss the petition in error, on the ground that the Court of Appeals was without right or authority to entertain, hear or determine the proceeding in error.
On February 19, 1934, the Court of Appeals overruled the motion to dismiss the proceeding in error, determined the case on its merits, and reversed the trial court as to counts three and four of the indictment, and certified the case to this court as a conflict case.
While counsel herein traveled a long and labyrinthine way, they came out with issues remarkably clean cut.
The indictment herein was drawn under favor of Section 710-172, General Code:
"Whoever being an officer, employee, agent or director of a bank, embezzles, abstracts, or wilfully misapplies any of the money, funds, credit or property of such bank whether owned by it or held in trust, or wilfully and fraudulently issues or puts forth a certificate of deposit, draws an order or bill of exchange, makes an acceptance, assigns a note, bond, draft, bill of exchange, mortgage, judgment or decree, or makes a false entry in a book, report or statement of such bank, or makes a false statement or certificate as to a trust deposit, fund or contract, for or under which such bank is acting as trustee, or fictitiously borrows or solicits, obtains or receives money for the bank not in good faith intended to become and be the property of the bank, with intent to defraud or injure the bank or another person or corporation, or to deceive an officer of the bank or an agent appointed to examine the affairs of such bank, or publishes a false statement or report relating to the financial condition of the bank with intent to defraud or injure it or another person *Page 505 
or corporation, shall be fined not more than ten thousand dollars, or imprisoned in the penitentiary not more than thirty years, or both." (108 Ohio Laws, pt. 1, 123.)
Stripping this section to the skin we find that "undressed" it reads that: Whoever, being an officer of a bank, wilfully misapplies any funds of such bank with intent to defraud or injure the bank or any person or corporation, shall be punished as therein provided.
The misapplication complained of in this indictment must lie in the unlawful payment of dividends, else there is no misapplication. As a matter of right and righteousness, it has been, is and should be the purpose of our legislation to so frame our banking laws as to best safeguard depositors. This rule is dictated by common sense, which is Synonym No. 1 for good judgment. It is the depositors' money that makes it possible for a bank to function, and it is bad policy under any and all circumstances to in any wise injure "the goose that lays the golden egg."
The banking laws of the State of Ohio are rather sensitive about dividends. Money that goes out of the bank in the form of dividends sometimes finds its way back; many times it does not. When a bank begins to totter, the directors and officers ought to and usually do know it first, then it is sensed by the stockholders entitled to dividends. The depositor is the last to get the information, and he usually gets it from the Superintendent of Banks. Because of this situation, our General Assembly has seen fit to say a few things about dividends. It has told the state banking institutions just how and when they can pay dividends, and the officer of such an institution who walks in the face of these directions is "skating on thin ice"; but does he violate a criminal statute?
The trial court denied the sufficiency of the indictment *Page 506 
herein, upon the ground that Sections 710-130 and 710-134, General Code, carry no penalty for their violation.
Section 710-130, General Code, provides in part as follows:
"The board of directors of any bank may declare a dividend of so much of its undivided profits as they deem expedient."
Section 710-134, General Code, provides in part as follows:
"The surplus of any bank shall not be used for the payment of dividends nor shall the same be used for the payment of expenses or losses until the credit to undivided profits on the books of the bank has been exhausted."
The act of declaring a dividend is perfectly lawful, but it may become unlawful if the declarants, in order to pay it, must take the moneys of the institution, which the law says they shall not take. And if they do take it for such purpose, with intent to defraud the institution of which they are officers, or its depositors, are they not misapplying the funds of the bank, with an intent that characterizes the act as criminal?
Intent, of course, is gathered from surrounding circumstances. An insolvent bank can have no such thing as undivided profits. It is a financial impossibility, and its officers are charged with a knowledge of it. If there are no undivided profits with which to pay the dividend, the payers must go to the surplus, or the general deposit, or commercial fund of the bank to pay it, when these funds, as a matter of right, belong to the depositors. It is not enough to say such action carries a badge of fraud". The question is, is it criminal?
The Court of Appeals found to the effect, and we adopt its reasoning, that our banking laws provide how the funds of a bank shall be applied, and forbid the *Page 507 
application of funds in particular ways; and we find that Section 710-67, General Code, provides generally the means whereby damages can be recovered from those responsible for the misapplication of the bank's funds, but search the banking laws as we may we can not find wherein a penalty is provided for the violation of the dividend statute.
"Misapply" is a common, usual word; and unless it is manifestly apparent that the Legislature in its use in the statute complained of herein intended to ascribe to it an uncommon, unusual meaning, we must give it its recognized meaning in common parlance, namely, "to apply wrongly".
If the officers of this bank had paid dividends from undivided profits, as provided by statute, they would have applied the money rightfully. When they paid the dividends from moneys which the statutes provided should not be applied to the payment of dividends, they applied it wrongfully. In other words, misapplied it, and would be liable in the civil action herein referred to.
It is further contended that inasmuch as our Banking Laws herein involved are copied from the Federal Banking Act, and that Act had been construed by the federal courts when the General Assembly passed our banking laws, such laws were passed in the light in which they had been construed.
The case of Gale v. Priddy, 66 Ohio St. 400, 64 N.E. 437, is cited, and is quoted from at page 406, as follows:
"When a statute is adopted from another state where it has received a settled construction, the presumption is that such construction was adopted and that the terms of the statute are used in the same sense."
The Court of Appeals gave consideration to this dictum. It was no part of the law of the case, but it did *Page 508 
set out the rule that the court followed in construing the special verdict statute under consideration. This is a reasonably good rule, but, as was pointed out by the Court of Appeals, it has its exceptions and limitations, which are dealt with in 25 Ruling Case Law, 1073, Section 295, as follows:
"The general rule just stated as to the construction of adopted statutes is by no means absolute, or imperative on the courts of the adopting state, but is subject to numerous exceptions. The rule that the adoption of a foreign statute carries with it the prior construction in the originating state has been held to be applicable only where the terms of the statute are of doubtful import, so as to require construction. So the rule has been declared to be inapplicable where radical or material changes are made in the statute; * * * where the foreign construction is not in harmony with the constitution of the adopting state, or is contrary to the spirit and policy of the jurisprudence of the adopting state; or where the courts of the adopting state are clearly of the opinion that the foreign construction is erroneous, or that its application would lead to a denial of a substantial right."
Beyond doubt we did resort to the Federal Banking Law for some considerable part of our State Banking Law. Upon examination we find that Sections 5190 to 5219, inclusive, Revised Statutes of the United States (Title 12, Section 81et seq., U.S. Code), deal with the subject "Regulation of the Banking Business." Upon comparison, we find that the three sections hereinafter set out bear some close semblance to the statutes of our state herein involved, to-wit:
"Sec. 5199. The directors of any association may, semi-annually, declare a dividend of so much of the net profits of the association as they shall judge expedient; but each association shall, before the declaration of a dividend, carry one-tenth part of its net profits of *Page 509 
the preceding half-year to its surplus fund until the same shall amount to twenty per centum of its capital stock." (Title 12, Section 60, U.S. Code.)
"Sec. 5204. No association, or any member thereof, shall, during the time it shall continue its banking operations, withdraw, or permit to be withdrawn, either in the form of dividends or otherwise, any portion of its capital. If losses have at any time been sustained by any such association, equal to or exceeding its undivided profits then on hand, no dividend shall be made; and no dividend shall ever be made by any association, while it continues its banking operations, to an amount greater than its net profits then on hand, deducting therefrom its losses and bad debts. All debts due to any association, on which interest is past due and unpaid for a period of six months, unless the same are well secured, and in process of collection, shall be considered bad debts within the meaning of this section. But nothing in this section shall prevent the reduction of the capital stock of the association under section fifty-one hundred and forty-three." (Title 12, Section 56, U.S. Code.)
"Sec. 5209. Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or wilfully misapplies any of the moneys, funds, or credits of the association; or who, without authority from the directors, issues or puts in circulation any of the notes of the association; or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree; or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed *Page 510 
to examine the affairs of such association; and every person who with like intent aids or abets any officer, clerk, or agent in any violation of this section, shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten." (Title 12, Section 592, U.S. Code.)
Sections 710-148, 710-129, 710-130, and 710-172, of the General Code of Ohio, correspond with these federal statutes in more than a general way; but to say that our State Banking Law is a complete replica of the Federal Banking Act is making it altogether too strong. They are different in many respects, but very similar so far as the questions herein involved are concerned. In truth, the likeness of the one law to the other, except in the respects hereinbefore pointed out, is rather faint; but in those particular respects, it is rather strong. Our state law is much more comprehensive.
The decisions of the federal courts are most favorable to the accused, and if this court must follow them, then this case is easily determined.
There are four cases, known as the "Britton cases," that deal with the sufficiency of indictments under the Federal Banking Act, namely:
United States v. Britton, 107 U.S. 655, 27 L.Ed., 520,2 S.Ct., 512; United States v. Britton, 108 U.S. 192,27 L.Ed., 703, 2 S.Ct., 525; United States v. Britton,108 U.S. 193, 27 L.Ed., 701, 2 S.Ct., 526; United States v. Britton,108 U.S. 199, 27 L.Ed., 698, 2 S.Ct., 531.
The particular case, 108 U.S. 199, holds flatly that the declaration of a dividend by the directors of a bank under the Federal Banking Act, where there are no not profits out of which to pay it, as required by the Act, is an act of maladministration of the affairs of the bank, but is not criminal.
The case of Evans v. United States, 153 U.S. 584, *Page 511 38 L.Ed., 830, 14 S.Ct., 939, is a later case, involves the construction of the same statute, Section 5209, Revised Statutes of the United States, and is somewhat more favorable to the state. Justice Brown, in rendering the opinion, refers to the Britton case, supra, and, while he does not overrule it, he says:
"The criminality really depends upon the question whether there was, at the time of the discount, a deliberate purpose on the part of the defendant to defraud the bank of the amount."
The Evans case takes none of the "sting" out of the Brittoncase, supra.
We note that a number of other states have refused to follow the decisions of the federal courts in the construction of the banking laws. It may be that their statutory set-up warrants such a departure.
This court now comes to the parting of the ways. It must either follow the path designated by the federal decisions, or blaze a trail of its own.
The form and content of the indictment are of little moment in this case. For the purposes of the argument it will be admitted that the indictment properly charges an offense if the statutes involved create an offense.
In a few words, do our banking laws make it a crime for the officers of a state bank to declare a dividend when there are no undivided profits, as provided by statute, to pay such dividend?
We agree that it is a bad practice — but is it a crime?
The latest case bearing on the question before us isUnited States v. Brown, 6 Fed. Supp., 331, decided December 16, 1933. Judge Hough in that case held that a national bank's directors and borrower who knowingly made loans in excess of ten per cent. of the bank's authorized capital, contrary to statute, were not indictable for conspiracy to commit an offense against the laws of the United States, and that the statute grants only a civil remedy. *Page 512 
He states in the dictum: "An offense is contemplated only when a criminal statute is violated."
A statute cannot be classed as a criminal statute unless a penalty is provided for its violation.
A criminal statute without a penalty is fundamentally nugatory.
It is claimed by the state that Section 710-172, General Code, is an omnibus penalty statute, providing a penalty for all violations of the banking laws, except those sections wherein a specific penalty is provided for. Such thing can be done. It has been done by the General Assembly of Ohio, notably in the motor vehicle and intoxicating liquor laws. To our knowledge no one has ever insisted that the penalty should be included in the same section of the statute that defines the crime. All that is necessary is that a penalty be provided for the violation of the section in question. But the penalty must be provided, and it should be provided with that degree of clarity that characterizes all criminal law, to the end that its application must not be left to conjecture.
Reference to the motor vehicle and intoxicating liquor laws divulges the fact that the penalty provisions are so clear and clean cut as to leave no room for doubt.
These penalty provisions are usually, but not always, made the subject-matter of the last section of the act, and the language used is, "Whoever violates any of the provisions of this act," etc., or "Whoever violates any of the provisions of this act except" certain sections, shall be punished as provided by the penalty provision.
It is the theory of the state that the accused, as president of the bank, caused certain moneys to be applied to the payment of dividends when the bank had no undivided profits from which to pay such dividends, and that the non-existence of undivided profits was caused by the over-valuation of assets and a failure *Page 513 
to charge and deduct from its actual profits all losses sustained and depreciation in the assets of the bank.
Our Legislature has provided a plan by means of which to arrive at the undivided profits of a state bank. Section 710-130, General Code:
"The board of directors of any bank may declare a dividend of so much of its undivided profits as they deem expedient. Before such dividend is declared, not less than one-tenth of the net earnings of the company for the preceding half-year, or for such period as is covered by the dividend, shall be carried to surplus, until such surplus amounts to fifty per cent of its capital stock.
"In order to ascertain the undivided profits from which such a dividend may be made, in the account of profit and loss there shall be charged and deducted from the actual profits:
"(1) All ordinary and extraordinary expenses, paid or incurred, in managing the affairs and transacting the business of the bank,
"(2) Interest paid or then due, on debts which it owes,
"(3) All taxes due,
"(4) All losses sustained by the corporation. In computing its losses, debts owing to it which have become due and which are not in process of collection and on which interest for one year or more is due and unpaid, unless same are well secured, and debts upon which final judgment has been recovered, but has been for more than one year unsatisfied, and on which also for said period of one year, no interest was paid, unless same are well secured, shall be included."
The superintendent of banks has full power and authority to supervise and regulate the value of securities held by state banks, as will be learned by reading Section 710-111, General Code:
"* * * The superintendent of banks shall have the power to require any security to be charged down *Page 514 
to such sum as in his judgment represents its value. The superintendent of banks may order any securities which he deems undesirable removed from the assets of a bank."
It will be observed that Section 710-130, General Code, carries with it no penalty for its violation.
As gleaned from the prosecutor's bill of particulars, the gravamen of the offense sought to be charged in the third and fourth counts of the indictment herein is, in substance, putting it rather awkwardly, that if the accused had not overvalued, and had not failed to charge and deduct from its actual profits all losses sustained and depreciation in the assets of the bank, there would have been no undivided profits from which to declare dividends.
From this we must take it e converso that there was an undivided profits account from which the dividend in question could be and was paid, but such account was spurious because the statute had not been followed in producing it.
Suppose in defending against counts three and four of the indictment, leaving out of consideration the bill of particulars, the accused in his defense had brought into court the books of the bank, showing that there was an undivided profits account from which the dividend in question was paid, would not such fact work an acquittal of the accused? Counsel for the state would probably rejoin something in this fashion: "We admit that the books of the bank show an undivided profit account, but it was not arrived at in accordance with the provisions of the statute."
Counsel for the accused would naturally interpose the argument that he had fully met the state's case. Thereupon counsel for the state ask leave to and do amend the indictment by inserting the allegations contained in the state's bill of particulars herein, thereby bringing the charge within the purview of Section 710-130, General Code. Thereupon, counsel for the *Page 515 
accused demurs to the indictment in its present form, on the ground that Section 710-130, General Code, is not a criminal statute, as no penalty is provided for its violation. The court may or may not entertain the demurrer. If the court does not entertain the demurrer, the accused "strings along" until a verdict of guilty is returned against him, when he moves in arrest of judgment upon the grounds set out in his demurrer, and the court finds itself face to face with the same proposition.
Is Section 710-130, General Code, a criminal statute standing alone or taken in connection with Section 710-172, General Code?
We note that counsel for the state catechized the trial court at length, in an endeavor to learn the reason why he sustained the demurrer to the third and fourth counts of the indictment. The trial judge was very patient and answered the various questions at length, when he might have answered them all in one sentence, namely, "No crime is charged", for that was, in effect, his ruling.
We note that the Supreme Court of Massachusetts, in the case of Commonwealth v. Nichols, 257 Mass. 289, 153 N.E. 787, refused to follow the decisions of the United States Supreme Court in the Britton, Northway and Evans cases.
The Supreme Court of Arizona, in the case ofKingsbury v. State, 27 Ariz. 289, 232 P. 887, says: "We have great respect for the decisions of the federal court, but in matters involving the construction of our own statutes, their opinions, while persuasive, are not binding."
Later, when the same case was before the same court on rehearing, Kingsbury v. State, 28 Ariz. 86, 235 P. 140, the court said:
"Counsel for defendant express great alarm at the decision of this court to the effect that it is not absolutely and conclusively bound by the decisions of *Page 516 
another court construing statutes of its jurisdiction, whose substance we have adopted in Arizona, when such decisions are, in our opinion, not in accord with sound logic or fundamental principles of common sense and justice, and confess their utter inability to assure any citizen of the safety of life, liberty and property under such a rule.
"We feel that they are unduly alarmed. The great commonwealths of Wyoming, Texas, Colorado, Michigan, Montana, Utah, Mississippi, Missouri, and many others have long held this doctrine, and we have yet to learn that life, liberty and property are more unsafe therein than elsewhere in our country. * * *
"We appreciate what counsel state in regard to the importance of federal decisions, and the rule of taking any statute with the construction placed on it within the jurisdiction from which it came, but we feel it of even greater importance, that when our legislature has passed a law to meet a prevalent evil, a logical construction of that law and one best calculated to remedy that evil should be adopted. We see no reason to recede from the position previously taken on this point."
The learned Court of Appeals in the instant case was evidently impressed by these decisions, for in the latter part of its opinion it says:
"In our judgment the federal decisions, even though they go as far as contended by defendant in error, are not binding on this court, and we are of opinion that the only wholesome construction of our banking law that is open to us requires us to hold that the third and fourth counts of the indictment state an offense and the court erred in adjudging these counts insufficient."
We appreciate the fact that Ohio has thrown aside the archaic interpretation of criminal statutes; that our new criminal code has done away with the subtle niceties of the criminal law as we took it from the common law; that it is well nigh impossible under our law *Page 517 
as it now stands to draft an insufficient indictment. If the indictment happens to be faulty when it is returned, it can be worked over until it conforms to the requirement of the most fastidious.
Are we comforted in this case with all this knowledge? Not in the least.
We do not regard ourselves as being married to the decisions of the Supreme Court of the United States as a general proposition, especially when the construction of our own statutory law is the question before us. We are aware, that, while we have no federal common law crimes, federal courts resort to the common law in the construction of federal criminal statutes. We regard an opinion of the Supreme Court of the United States as the concrete product of nine of our best legal minds. But no decision of any court is better or stronger than the reasoning behind it, and we look behind the opinion in order to ascertain the means by which it was reached.
The banking laws herein involved were taken from the Federal Banking Act. There is rather striking similarity between Section 5209, Revised Statutes of the United States, and Section 710-172, General Code of Ohio, and between Section 5204, Revised Statutes of the United States, and Section 710-130, General Code of Ohio.
In well-reasoned opinions the Supreme Court of the United States has said, in effect, that the declaration and payment of dividends by the directors of a national bank, when there were no net profits with which to pay them, were acts of maladministration subjecting those participating therein to a civil action for damages, but that such acts were not criminal as they were not made so by statute. We find the same conditions obtain with reference to the banking laws of Ohio, herein involved. No criticism can be placed at the door of the prosecutor's office in this case. The third and fourth counts of the indictment as amplified by the bill of *Page 518 
particulars were probably so sufficiently specific as to come within the law as announced in the case of State v. Whitmore,126 Ohio St. 381, 185 N.E. 547. If the indictment was not specific to that extent, it could have been amended as authorized by Breinig v. State, 124 Ohio St. 39,176 N.E. 674.
If it is the consensus of public opinion that our banking laws have not enough teeth, the legislative dentist can readily supply them.
Holding, as we do, that the statutes herein involved are not criminal statutes, it is unnecessary to pass upon the other questions raised herein, namely, jurisdiction of the Court of Appeals to entertain the case, and double jeopardy.
Feeling that in this particular case we are obliged to follow the decisions of the Supreme Court of the United States, the judgment of the Court of Appeals herein is reversed and that of the Court of Common Pleas is affirmed.
Judgment of the Court of Appeals reversed and judgment of theCourt of Common Pleas affirmed.
JONES, MATTHIAS, BEVIS and WILKIN, JJ., concur.
WEYGANDT, C.J., and ZIMMERMAN, J., dissent.
WEYGANDT, C.J., dissents for the reasons that the view of the majority involves too narrow a construction of the Ohio statutes, and the authorities relied upon are concededly not binding upon this court.